## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| BRIANNE SIX, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. CIV-22-175-SLP |
| | ) | |
| AMERICAN FIDELITY ASSURANCE | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## O R D E R

Before the Court is the Motion for Summary Judgment and Brief in Support [Doc.
No. 27] filed by Defendant American Fidelity Assurance Company ("American Fidelity").
It is at issue. *See* Pl.'s Resp. [Doc. No. 32]; Def.'s Reply [Doc. No. 37].  Plaintiff filed suit
against American Fidelity, alleging unlawful retaliation and interference in violation the
Family and Medical Leave Act of 1993 ("FMLA"), and unlawful gender discrimination in
violation of Title VII of the Civil Rights Act of 1964.  *See* Am. Compl. [Doc. No. 17].
American Fidelity has moved for summary judgment on each of Plaintiff's claims.  For the
following reasons, the Motion is DENIED.

## I.    Governing Standard

Summary judgment is warranted "if the movant shows that there is no genuine
dispute as to any material fact and the movant is entitled to judgment as a matter of law."
Fed. R. Civ. P. 56(a).  An issue is "genuine" if the evidence in the record would permit a
reasonable jury to find in favor of the nonmoving party.  *Matsushita Elec. Indus. Co. v.
Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  "Material" issues of fact include those "that

might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The Court's function is not to weigh the evidence, but to determine whether there is a genuine issue for trial.  *Id.* at 249; *see also Roberts v. Jackson Hole Mountain Resort Corp.*, 884 F.3d 967, 972 (10th Cir. 2018).  In doing so, the Court "view[s] the factual record and draw[s] any reasonable inferences therefrom in the light most favorable to the nonmoving party."  *Adams v. Am. Guarantee & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000).

## II.   <u>Undisputed Material Facts</u>[1]

American Fidelity is a company that provides voluntary supplemental health insurance and tax-deferred annuities to its clients through the United States.  Plaintiff began working for American Fidelity as a customer service representative on May 2, 2007.  On or about April 14, 2018, she transitioned into a management-level role in American Fidelity's Enrollment Solutions division.[2]   As a supervisor, Plaintiff oversaw a team of nine enrollment technicians.  These technicians work with American Fidelity's salespeople "to build the platform for the customers to allow their employees to enroll in [American Fidelity's] products."  Def.'s UMF ¶ 14.  As a supervisor, Plaintiff was responsible for conducting monthly one-on-one meetings with each enrollment technician on her team.

---

[1] The Court includes facts that are material, supported by the summary judgment record, and not genuinely disputed.  *See* Fed. R. Civ. P. 56(c).

[2] Plaintiff was offered the role of "Team Leader, Product Only Enrollment" but the title of the position later changed to "Supervisor, Product Only Enrollment."  Def.'s UMF ¶ 11.

Because she was expected to answer her subordinates' questions, Plaintiff was required to have vast substantive knowledge about American Fidelity's insurance products.

When Plaintiff became a supervisor, she reported to Amy Pledger.  Plaintiff met with Ms. Pledger on or about June 1, 2019 for her annual review.[3]   Ms. Pledger rated Plaintiff as a 2.0 out of 4.0, which signaled that Plaintiff's "performance met some but not all of the duties and competencies as defined in the job description, and may represent a growing knowledge base as [she] continues to learn in the position." [Doc. No. 27-9] at 2. Specifically, Ms. Pledger observed that "[s]ometimes [Plaintiff's] emotions get the best of [her] and that comes across negatively in meetings or in conversation within the office." *Id.* Ms. Pledger concluded: "Conflict and discussion is good but it needs to be constructive and being open to other opinions or ideas is important in leadership." *Id.*

The following year, Ms. Pledger raised Plaintiff's rating to a 3.0 out of 4.0, which indicated her "performance was consistently at and sometimes above the duties and competencies as defined in the job description." [Doc. No. 32-4] at 1.  Ms. Pledger commented:

> I have seen a tremendous amount of growth in you this past year.  Your confidence and willingness to speak up in meetings is a direct result of your increase in knowledge about the system and the department. . . . I am happy to have you on the team and you have done a great job this year.  I encourage you to work on constantly improving and [to] continue to gain more knowledge.

---

[3] American Fidelity misstates the date of this review: it occurred in 2019, not 2020.  *Compare* Def.'s UMF ¶ 16 (listing June 1, 2020), *with* 2019 Annual Review [Doc. No. 27-9] (listing June 1, 2019).  Though Plaintiff disputes this fact, her challenge rests entirely on this discrepancy—not on the existence or substance of the 2019 review.

*Id.* at 1–2.

In March 2021, Kyle Ramsey became Plaintiff's supervisor following a restructuring in the division.[4]  On or about June 1, 2021, Mr. Ramsey conducted Plaintiff's annual review and rated Plaintiff as a 3.0 out of 4.0.  Mr. Ramsey's developmental comments read:

> Moving forward I expect [Plaintiff] to continue building her relationship with her new colleagues. I want her to be a coach to them and help guide them through the issues that they are coming across in the new states they are working.  I want her to be proactive to help them get training, when necessary, mentoring them through difficult enrollment issues by helping them get answers and to continue strengthening her relationship and trust with them.

> Building her relationship with the field in her new territory is critical to our success.  She needs to gain their trust so that when an issue comes up or if there is a process in a specific state's case build that needs to be evaluated, she can approach them constructively and they will not immediately shut her out.

> I want her to be proactive as the senior most Product Only Supervisor and emerge as the clear-cut leader out of the two Supervisors.  I want her to continue providing feedback and opinions in the team meetings and be open minded to new ideas [that] are presented that may differ from her viewpoint. She needs to continue to build her setup knowledge base as well as how it correlates with the data team.  It may be wise to look at some trainings.  It's important that she has a complete understanding of the Product Only offering to ensure that she can be solutions oriented and see the gray area's [sic] of her position.

[Doc. No. 27-11] at 3.  Plaintiff left the meeting believing she was "doing a good job."  Six. Dep. [Doc. No. 32-1] at 150:15–20.  Similarly, Mr. Ramsey agreed he did not perceive the meeting as a counseling session.

---

[4] Though Plaintiff had previously been responsible for the West Coast region, she assumed responsibility for the East Coast region following the restructuring.

But in June or July 2021, Mr. Ramsey began "receiving some feedback from members of [Plaintiff's] team about her knowledge" and "about her tact with the team."[5] Ramsey Dep.   [Doc. No. 27-10] at 37:19–38:3.   A third-party administrator approved Plaintiff's request to take continuous FMLA leave from August 26 through October 11, and intermittent FMLA leave between October 6 and December 31, 2021.   The third-party administrator copied Mr. Ramsey on the letter approving these requests.   *See* [Doc. No. 32-8] at 2.   Plaintiff's continuous FMLA period coincided with the busiest time of year for her department, which lasts from August until October.

While Plaintiff was on continuous leave, Mr. Ramsey conducted one-on-one meetings with all nine of Plaintiff's enrollment technicians—at least three of whom raised concerns about Plaintiff.   During a September 21 meeting, technician Amber Cogbill told Mr. Ramsey that she tried to schedule a meeting with Plaintiff, but that Plaintiff said she did not have time.[6]   The next day, technician DeAndra Taplin told Mr. Ramsey that Plaintiff did not consistently conduct one-on-one meetings, communicate frequently, or provide necessary support.   On September 27, technician Kerry Silwick echoed Ms.

---

[5] Because Plaintiff neither admitted nor denied this factual assertion, the Court considers it to be undisputed.   *See* Fed. R. Civ. P. 56(e)(2).   There is a genuine factual dispute as to whether Mr. Ramsey shared this feedback with Plaintiff before she began taking FMLA leave for her medical condition, as detailed *infra*.

[6] This evidence, along with much of the other evidence in the record, is arguably hearsay.   But because Plaintiff did not raise any hearsay objections, the Court "consider[s] all relevant evidence in the record and do[es] not disregard any evidence *sua sponte*." *Bird v. W. Valley City*, 832 F.3d 1188, 1194 n.1 (10th Cir. 2016) (citing *Talavera ex rel. Gonzalez v. Wiley*, 725 F.3d 1262, 1267 (10th Cir. 2013)); *see also Armijo v. Santa Fe Cnty.*, 2018 WL 3118290, at *7 (D.N.M. June 25, 2018) ("[T]he generalized rule against hearsay in the content of the materials used to support a movant's motion for summary judgment presupposes a proper objection on the grounds of hearsay, so that the hearsay objection is fairly in front of the court.").

Taplin's comment that her one-on-one meetings with Plaintiff were inconsistent. She also told Mr. Ramsey that asking Plaintiff for help was a "waste of time," that Plaintiff is a "liar," and that she "doesn't like" Plaintiff. [Doc. No. 27-15] at 4.

Sometime before she returned from continuous FMLA leave, Plaintiff advised Mr. Ramsey that she may need to use intermittent leave to attend medical appointments or if her condition worsened. She returned from continuous FMLA leave on October 11, working from home with Mr. Ramsey's approval. That same day, Plaintiff met virtually with Mr. Ramsey. During this meeting, Mr. Ramsey "mentioned several times" how busy Plaintiff's team had been during her absence. Six Dep. [Doc. No. 32-1] at 155:22–156:6. Plaintiff testified "it felt like he was saying" that she "need[ed] to be here." *Id.* Mr. Ramsey also informed Plaintiff that some of her subordinates had raised concerns while she was on leave—specifically that they felt Plaintiff "push[ed] them off" by "telling them to go somewhere else" instead of answering their questions. Six Dep. [Doc. No. 27-2] at 76:17–77:19; 82:3–14. Plaintiff believed the criticism stemmed from her illness in the weeks leading up to her leave, during which she admitted she "could have possibly missed something or miscommunicated something." *Id.* at 123:4–16. Plaintiff advised Mr. Ramsey that she would like to meet with her team to discuss her health issues and ensure "they understood . . . what [she] went through." *Id.* at 76:17–77:19. She testified that Mr. Ramsey did not share any additional concerns with Plaintiff in this meeting, *id.* at 86:3–14, and they "didn't talk about discipline." Six Dep. [Doc. No. 32-1] at 151:13–25.

On October 21, Plaintiff held a virtual meeting with her team. Stacie Boone—the other supervisor in Plaintiff's division—and Ms. Boone's team were also present during

the first half of the meeting.[7]   After Ms. Boone and her team left, Plaintiff told her subordinates that she "was much sicker than [she] had thought" during the weeks before she took leave, "[a]nd that her communication probably wasn't the best."  Six Dep. [Doc. No. 27-2] at 92:20–93:8.  Plaintiff then told her team that Mr. Ramsey "had brought up that some issues had come up when [she] was out," and that she "wanted everybody to know that they could come to [her] if they were unhappy with [her] or unhappy with an answer that [she] gave them or something that [she] had done."  *Id.* at 93:9–15.  She also explained that she wanted her team members to "try to find the answer [themselves] and do some research" before she gave them the answer or found it for them.  *Id.* at 93:16–21.  At that point, Ms. Silwick questioned why Plaintiff's subordinates even "needed a team leader if [they] couldn't ask questions."  *Id.* at 93:22–24.  Plaintiff answered Ms. Silwick's question but admitted that she "could have come off" as acting defensively.  *Id.* at 142:7–14.

Later that afternoon, Ms. Boone emailed Mr. Ramsey to share her concerns about the meeting.  She summarized the portion of the meeting she attended, noting that Plaintiff was "coming across very strong" and using a "you are in trouble" tone.  [Doc. No. 27-16] at 2.  She also described the response from Plaintiff's subordinates, noting:

- "I stood up and saw Cristina with her hands over her mouth during their call and peoples['] faces did not look happy."
- "After the call was over I did hear Cristina and Colin both stand up and say oh my gosh and Amanda was standing as well, so I walked over and they let me

---

[7] Though Plaintiff asserts that Mr. Ramsey was at this meeting, *see* Pl.'s Resp. to Def.'s UMF ¶ 33, her cited deposition testimony, in which she testified she "think[s]" Mr. Ramsey attended, *see* Six Dep. [Doc. No. 27-2] at 90:25–91:12, is not sufficient to create a genuine dispute.

know that [Plaintiff] had said 'Kyle [Ramsey] let me know you guys have complained about me.' They said they could tell it caught people off guard."

- "Lena . . . said at some point this is why not [sic] one goes to her because she does not help."

*Id.*  Ms. Boone also forwarded Mr. Ramsey several instant messages that she received during the meeting.  Amanda Thurman sent the following messages:

- "She just yells at us. LOL"
- "[S]he looks like she is dressed to be in the move Beetle Juice [sic]"
- "She is telling us that Kyle [Ramsey] told her we complained and she is trying to dig herself out of a hole"

*Id.* at 3–4 (punctuation in original).  Ms. Silwick's messages read:

- "she's absolutely ridiculous and looked like she was dressed for a bar to get picked up. no class whatsoever"
- "seems to me she's not needed at all if we're not allowed to go to her[.] what a waste of a salary"

*Id.* at 4–5 (punctuation and capitalization in original).

After receiving this feedback, Mr. Ramsey met with Plaintiff to "ask[] her what happened from her perspective" and "let her know that [he] ha[d] received feedback that some of the things that [they] ha[d] discussed prior to that specific incident didn't seem to be happening."  Ramsey Dep. [Doc. No. 27-10] at 91:1–12.  He recalled the conversation as being "very short."  *Id.*  Plaintiff recalled Mr. Ramsey asking whether she "had told [her] team everything that he had told [her]."  Six. Dep. [Doc. No. 27-2] at 128:3–129:4.  She "said no" and explained that she "present[ed] that [she] knew there was a problem, but [] didn't go into detail."  *Id.*  Plaintiff testified that Mr. Ramsey "said okay" in response, but that "[n]othing" else happened "until [she] was called in to be terminated."  *Id.*

Mr. Ramsey testified that, following the October 21 meeting, some of Plaintiff's team members "expressed dissatisfaction with being within our department if [Plaintiff] remained."   [Doc. No. 27-10] at 91:23–92:22.   Though he could not "recall anyone specifically expressing that they would leave," Mr. Ramsey testified that Plaintiff's team members "verbalized" their dissatisfaction to him and expressed "that they don't know if they can stay within our department if that's how things are going to be done with them and if that's how they're going to be treated."   *Id.*   Mr. Ramsey testified that he was concerned Plaintiff's team members "were in the most stressful point of their year potentially looking to leave our department."   *Id.* at 85:13–18.   While not the busiest time of the year, the last annual quarter is "a key time in [American Fidelity's] business cycle under Mr. Ramsey's supervision" because it is when technicians must "meet enrollment deadlines for participants and insureds."   Walling Dec. [Doc. No. 27-1] ¶ 6.

Mr. Ramsey recommended Plaintiff's termination to the Vice President of Enrollment Solutions, Cindy Walling, in late October 2021.   Ms. Walling "asked [Mr. Ramsey] to provide a summary and supporting documentation regarding [Plaintiff's] performance issues."   *Id.* ¶ 8.   Mr. Ramsey consulted with Ms. Boone and Tammy Newton, another supervisor in Plaintiff's division, about Plaintiff.   Ms. Boone and Ms. Newton then created an "outline" of feedback.   Ms. Newton's section of the outline included supporting documents and emails which spanned from January 27, 2020 through June 8, 2021, and primarily focused on Plaintiff's lack of knowledge and the "Lack of Trust from her Team." [Doc. No. 27-18] at 3.   Mr. Ramsey also compiled documents and emails into a feedback

outline about Plaintiff.[8]   *See* [Doc. No. 27-19].  He provided Ms. Walling with a copy of this document, the outline created by Ms. Boone and Ms. Newton, and Ms. Boone's email about the group meeting.

After reviewing these documents and speaking with Mr. Ramsey, Ms. Walling worked with Kim Brecheen, the "Assistant Vice President, Workforce Development Manager," to create a "Special Review."  Walling Dec. [Doc. No. 27-1] ¶ 9.  The Special Review "summariz[ed] the issues with [Plaintiff's] job performance as well as the appropriate disciplinary action based on [her] performance issues."  *Id.*  An earlier draft of this document, which was not provided to Plaintiff before her termination, referenced a 90-day performance review period that would occur before termination.  *See* [Doc. No. 32-6] at 3–4.  Ms. Walling stated that this paragraph was "copied and pasted from a template form not involving specifically [Plaintiff]."  Walling Dec. [Doc. No. 27-1] ¶ 10.  At the time of her termination, American Fidelity did not have a progressive discipline policy in place.[9]

---

[8] These documents span from April 28 through August 23, 2021.  Mr. Ramsey also references an incident from about one month prior, in which Ms. Newton asked to be moved away from Plaintiff.

[9] Though Plaintiff denies this assertion, her proffered evidence does not raise a genuine dispute over whether American Fidelity had a progressive discipline policy in place at the time of her termination.  Though American Fidelity asserts that it did not have a progressive discipline policy *at any time* during Plaintiff's employment, the existence of a progressive discipline policy before Plaintiff began working for Mr. Ramsey is not material.

First, Plaintiff testified she "had been told by defendant's HR team on many occasions that [American Fidelity] was required to go through the steps of progressive discipline prior to terminating another employee."  Six. Dep. [Doc. No. 32-1] at 114:8–17 (discussing Pl.'s Ans. to Int. 4).  Plaintiff recalled learning this information from "training classes, [and] leadership classes," though she admitted these classes occurred before she joined Mr. Ramsey's team.  *Id.* at 114:20–116:14.  She also recalled having conversations with Ms. Brecheen "about progressive [discipline]

The Special Review identified several issues with Plaintiff's performance, including: "lean[ing] on others too heavily for the answers to simple questions," by referring her team's questions "to other leadership colleagues and support colleagues"; reports from her team regarding "a lack of support, lack of leadership and lack of knowledge"; and behavior demonstrating a "lack of professionalism." [Doc. No. 27-20] at 3. The document also mentioned that Plaintiff had "not made the progress expected in several key areas including Communication, Process/System Knowledge and Leadership Skills," and was "less knowledgeable and far less effective than the other Team Leader who has been in their position for two years less." *Id.* The Special Review explained that Plaintiff's "skills [did] not promote the pro-colleague culture we have developed in Enrollment Solutions." *Id.*

The Special Review alleged that "many issues [] developed" while Plaintiff was on leave and that, following her return, American Fidelity "had a conversation to make her

---

– about how it works." *Id.* But the fact that she discussed progressive discipline with Ms. Brecheen at some point does not demonstrate the existence of a companywide policy at the time of her termination. Plaintiff could not recall discussing the issue with anyone else on American Fidelity's HR team. *See id.*

Next, Plaintiff asserts that "Defendant's discovery responses have created significant doubt about the completeness of its production of workplace policies." Pl.'s Resp. to Def.'s UMF ¶ 8. In response to Plaintiff's First Set of Requests for Production, Defendant apparently denied the existence of a formal progressive discipline policy, though this response is not included in the cited exhibit. And in its Responses to Plaintiff's Second Set of Requests for Production, American Fidelity "admit[ted] that it does not have a written step discipline policy." [Doc. No. 32-3] at 1. Accordingly, with respect to the relevant policy, Defendant's assertions have been consistent.

Finally, though the initial draft of Plaintiff's Special Review referenced a 90-day performance plan, Ms. Walling testified that this portion was copy and pasted from a template and erroneously left in the draft. Plaintiff has not provided any evidence to rebut this assertion, nor is the existence of this language sufficient to raise a genuine issue as to the existence of a companywide policy.

aware of the issues and concerns that her team raised in her absence" and counseled her to "work on communication, support, leadership, and knowledge." *Id.* But, the report went on, "[r]ather than take this feedback and try to turn it into something constructive, she chose to meet with her team in a group and confront them about it, accusing them of being upset with her and acting hyper-defensively." *Id.* Next, the document listed several examples of Plaintiff's issues with communication, leadership, and knowledge. Finally, the Special Review concluded:

> Overall, we feel that [Plaintiff] has not made the progress she should have made in her position, nor do we see the initiative or desire to improve. We have heard from more than one colleague that working with [Plaintiff] and being part of her team is "toxic" and is considered a "poisonous environment." We are hearing that colleagues are feeling "hopeless" about the future if they must remain on her team. They are struggling to work with her and often avoid her if they can. Her workstyle and lack of professionalism are not in line with the Enrollment Solutions culture and leadership expectations.
>
> We have built a strong reputation for having a positive and supportive work environment in Enrollment Solutions and [Plaintiff] does not demonstrate the values that have allowed us to maintain excellent colleague retention and customer satisfaction.
>
> Due to the criticality of her role, in leading a team of colleagues and supporting our field colleagues and employer customers, we (Keith Johnson, SVP, Chief Sales Officer; Chris Rodriguez, VP, Regional Manager, Customer Experience; and Cindy Walling, VP, Enrollment Solutions) support [Plaintiff's] termination effective immediately.

*Id.* at 4. American Fidelity terminated Plaintiff on November 3, 2021. That same day, Plaintiff texted a coworker about her termination. Specifically, she stated American Fidelity told her: (1) her "colleagues don't trust or like [her]," (2) she has "no leadership

skills," and (3) her "colleagues want to move elsewhere." [Doc. No. 27-21]. American Fidelity hired a female employee to fill Plaintiff's former position.

Only one other management-level employee within Plaintiff's chain of command was terminated between January 1, 2016 and November 3, 2021. Ms. Walling, who directly supervised that male manager ("Mr. A"), placed him on a written action plan for poor job performance and ultimately terminated him after he failed to improve. Ms. Walling prepared Mr. A's special review document, which focused on the ways in which his lack of substantive knowledge affected his team, peers, and customers. In the review, Ms. Walling stated that Mr. A's team thought "he lack[ed] credibility" and perceived his regular check-ins during busy season as "micro-managing" and "a nuisance to them rather than a help." [Doc. No. 34-10] at 5, 11. Nevertheless, Ms. Walling later stated that Mr. A "had very good communication skills and a strong relationship with his team," and that she was not "concern[ed] that his subordinate colleagues may quit their employment" if he remained at American Fidelity. [Doc. No. 27-1] ¶ 13.

## III.   <u>Analysis</u>

### A.   **FMLA Retaliation**

Plaintiff argues that American Fidelity unlawfully retaliated against her for taking continuous FMLA leave, in violation of 29 U.S.C. § 2615(a)(2). FMLA retaliation claims are subject to the *McDonnell Douglas* burden-shifting framework. *Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1170 (10th Cir. 2006) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973)). Accordingly, "[P]laintiff bears the initial burden of establishing a prima facie case of retaliation," and then American Fidelity must

"offer a legitimate, non-retaliatory reason for the employment action." *Id.*   Finally, Plaintiff "bears the ultimate burden of demonstrating that [American Fidelity's] proffered reason is pretextual." *Id.*   Plaintiff concedes that American Fidelity has met its burden of production by articulating a facially nonretaliatory motive for her termination. *See* Pl.'s Resp. [Doc. No. 32] at 19.   Because Plaintiff can establish a prima facie case and has proffered sufficient evidence of pretext, American Fidelity is not entitled to summary judgment on this claim.

### 1.   Plaintiff's Prima Facie Case

To establish her prima facie case, Plaintiff "must show that: (1) she engaged in a protected activity; (2) [American Fidelity] took an action that a reasonable employee would have found materially adverse; and (3) there exists a causal connection between the protected activity and the adverse action." *Metzler*, 464 F.3d at 1171.   American Fidelity challenges only the causation element.   The "critical inquiry" at this step is "whether the plaintiff has demonstrated that [American Fidelity's] action occurred under circumstances which give rise to an inference of unlawful discrimination." *Id.* (quoting *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1221 (10th Cir. 2002)).

Plaintiff relies primarily, but not exclusively, on temporal proximity.   Temporal proximity may be sufficient to satisfy the causation element when "the termination is *very closely* connected in time to the protected activity." *Id.* at 1171 (quoting *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999)).   Though Plaintiff does not clearly

articulate which event constitutes the protected activity here,[10] "[t]he Tenth Circuit has []

indicated that the temporal proximity clock begins at the time that the employer knew of

the employee's plan to take FMLA leave." *Salemi v. Colo. Pub. Emps.' Ret. Ass'n*, 176 F.

Supp. 3d 1132, 1156 (D. Colo. 2016), *aff'd*, 747 F. App'x. 675 (10th Cir. 2018).  It is

unclear when American Fidelity initially learned Plaintiff planned to take FMLA leave, but

the parties agree that she began taking continuous FMLA leave on August 26.

Accordingly, her November 3 termination occurred about nine weeks after her protected

activity.  Standing alone, a six-week gap may be sufficient to establish causation, but a

twelve-week gap is too long.  *See Anderson*, 181 F.3d at 1179.  While the time period here

falls between these guideposts, Plaintiff is not relying on temporal proximity *alone*.

Instead, she has also proffered evidence that her continuous FMLA leave coincided with

the busiest time of the year.[11]  To be sure, this evidence would almost certainly not establish

causation on its own.  But when considered along witfh temporal proximity and the pretext

---

[10] For example, Plaintiff asserts that she "received further FMLA leave approval on October 6, returned to work on October 11, and informed Mr. Ramsey that she would likely need additional leave because of her continuing medical care on October 11."  Pl.'s Resp. [Doc. No. 32] at 18

[11] Plaintiff asserts that she has proffered evidence that "Mr. Ramsey [] was motivated to terminate [her] because her FMLA leave coincided with the busiest time of year, which he was not happy about."  Pl.'s Resp. [Doc. No. 32] at 19.  This assertion overstates the evidence in the record. Plaintiff has merely provided evidence that (1) her leave coincided with the busiest time of year, (2) Mr. Ramsey mentioned several times that the department had been very busy during her absence, and (3) Plaintiff interpreted Mr. Ramsey's comment to suggest she needed to be present. Plaintiff also relies on the fact that Mr. Ramsey knew she may need to take additional intermittent FMLA through the end of the year.  But this evidence is relevant to Plaintiff's interference claim, discussed *infra*, not her retaliation claim.

evidence discussed *infra*, there is sufficient evidence in the record to "give rise to an inference of unlawful discrimination."[12]  *Metzler*, 464 F.3d at 1171.

Though American Fidelity urges the Court to discount temporal proximity in this case, its argument is unpersuasive.  It asserts that when "performance problems [are] discovered while an employee is on leave, the fact that the employer discharges the employee when [she] returns from leave cannot be sufficient evidence to establish causation."  Def.'s Mot. [Doc. No. 27] at 19 (quoting *Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 634 (7th Cir. 2009)).  American Fidelity relies on two Seventh Circuit cases to support this contention, neither of which are persuasive here.  In those cases, the employer recommended termination while the employee was on leave and simply carried out that decision after the employee returned.  *See Anderson v. Nations Lending Corp.*, 27 F.4th 1300, 1303 (7th Cir. 2022); *Cracco*, 559 F.3d at 629.  Unlike the timing in those cases, there is no indication that American Fidelity decided to terminate Plaintiff based solely on performance issues discovered during her continuous FMLA leave.  To the contrary, Mr. Ramsey only recommended Plaintiff's termination *after* the October 21 team meeting that occurred at least ten days after she returned from continuous FMLA leave.  *Cf. Campbell v. Gambro Healthcare, Inc.*, 478 F.3d 1282, 1287–88 (10th Cir. 2007) ("[A] retaliation claim may be brought when the employee successfully took FMLA leave, was restored to

---

[12] Although evidence tending to reveal weaknesses in an employer's proffered reason for termination "is typically considered during the third phase of the *McDonnell Douglas* inquiry . . . [the Tenth Circuit] ha[s] considered evidence of pretext in the prima facie stage of a retaliation claim."  *Proctor v. United Parcel Serv.*, 502 F.3d 1200, 1209 (10th Cir. 2007) (analyzing ADA retaliation claim).

her prior employment status, and was adversely affected by an employment action based on incidents post-dating her return to work."). The Court therefore finds that Plaintiff has established her prima facie case.

### 2.    Pretext

"Pretext may be established by revealing 'weaknesses, implausibilities, inconsistencies, incoherence, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons.'" *Litzsinger v. Adams Cnty. Coroner's Off.*, 25 F.4th 1280, 1287 (10th Cir. 2022) (quoting *Jencks v. Mod. Woodmen of Am.*, 479 F.3d 1261, 1267 (10th Cir. 2007)).  But the proffered evidence must show "that the employer did more than get it wrong." *Id.* (quoting *Johnson v. Weld Cnty.*, 594 F.3d 1202, 1211 (10th Cir. 2010)).  Instead, it must permit a reasonable jury to conclude that American Fidelity "didn't really believe its proffered reasons for" terminating Plaintiff.  *Id.*  (quoting *Johnson*, 594 F.3d at 1211).  Though Plaintiff relies on several categories of evidence to support her pretext argument, the Court concludes that evidence regarding American Fidelity's investigation would permit a reasonable factfinder to conclude its termination decision was pretextual.

An employer's "'failure to conduct what appeared to be a fair investigation of' the violation that purportedly prompted adverse action may support an inference of pretext." *Smothers v. Solvay Chemicals, Inc.*, 740 F.3d 530, 542 (10th Cir. 2014) (quoting *Trujillo v. PacifiCorp*, 524 F.3d 1149, 1160 (10th Cir. 2008)).  A reasonable factfinder may make such an inference when an employer's termination decision is grounded in a one-sided

17

investigation.  In *Smothers*, the plaintiff and another employee got into a heated argument over a purported safety violation.  The other employee filed a complaint with the area supervisor, who then "spoke with [the plaintiff] and drafted a summary of their conversation."  *Id.* at 536.  The supervisor also discussed the incident with the complaining employee but did not tell the plaintiff "about [the other employee's] version of the events or ask [the plaintiff] whether he actually made" the statements the other employee alleged he did.  *Id.*  The employer suspended the plaintiff pending an investigation.  During this period, the manager visited the other employee at home to get a more detailed version of *his* side of the story but never contacted the plaintiff to do the same.  The other employee's summary, which included his description of the plaintiff's words and actions, was provided to a group of decisionmakers who ultimately terminated the plaintiff.  None of these decisionmakers spoke to the plaintiff, but several spoke to the other employee.  The group "relied heavily on [the other employee's] allegations—including [his] characterizations of [Plaintiff's] behavior—in deciding what discipline was appropriate."  *Id.* at 537.  The court held that a reasonable factfinder could conclude the employer's "investigation into the quarrel . . . was not fair or adequate."  *Id.* at 543.  The court suggested the outcome may have been different if the employer had first let the plaintiff respond to the allegations and then decided his version of events was not credible.  But instead, the decisionmakers "relied on one-sided information and accepted [the other employee's] allegations and negative

characterizations of [Plaintiff's] behavior" before firing the plaintiff "based largely on those tenuous conclusions." *Id.* at 542–43.

Indeed, the Tenth Circuit recently reaffirmed the importance the employee's involvement in the investigation.  In *Ibrahim v. Alliance for Sustainable Energy, LLC*, an employer terminated an employee who displayed "a lack of professionalism and judgment" in two separate incidents.  994 F.3d 1193, 1196 (10th Cir. 2021).  In the first incident, the plaintiff offered to help his subordinate, a female administrative assistant, pay for a rental car before inviting her to see a movie.  The administrative assistant "expressed concern to her supervisor, who discussed the incident with Dr. Ibrahim's supervisor."  *Id.* at 1195.  The plaintiff's supervisor had a casual conversation with him, cautioned him about making similar comments to subordinates, and advised him to "move on from the incident."  *Id.*  Soon after, the plaintiff told a visiting delegate "that he had gotten a positive vibe from her" and asked her about being taken seriously "as an attractive, young female."  *Id.*  An official with the consulate expressed concern to the plaintiff's supervisor weeks after the incident.  When his supervisor asked about this second incident, the plaintiff confirmed he made the statement but denied doing anything wrong.  Nevertheless, his employer put him on administrative leave and eventually terminated him based on these incidents.  The *Ibrahim* court found that the plaintiff "had raised a genuine factual dispute on the pretextual nature of [his employer's] explanation for the firing," in part based on the employer's "limited investigation."  *Id.* at 1197, 1199.  The court reasoned that, even though the supervisor had discussed both incidents with the plaintiff, their first conversation was casual, and the supervisor had not asked the plaintiff "why he had considered his comment

to [the delegate] as appropriate or different from his texts to [the administrative assistant]." *Id.* at 1200.  Instead, "[w]ithout Dr. Ibrahim's explanation, [his employer] inferred a lack of professionalism and judgment."  *Id.*

American Fidelity alleges it received three sets of complaints about Plaintiff following her annual review: (1) the June/July complaints about her knowledge and tact, (2) the September one-on-one complaints, and (3) the emailed complaints from Ms. Boone about the October 21 virtual meeting.  The parties dispute whether Mr. Ramsey discussed the June/July comments with Plaintiff before she began taking FMLA leave.  American Fidelity contends that Mr. Ramsey counseled her about the comments on August 24, 2021, *see* Ramsey Dep. [Doc. No. 27-10] at 38:16–41:1, but Plaintiff denied discussing her alleged performance deficiencies with Mr. Ramsey at any point between her annual review in June and the beginning of her FMLA leave, *see* Six. Dep. [Doc. No. 32-1] at 150:21–151:12.  Nevertheless, American Fidelity insists there is no genuine dispute because the record also includes Mr. Ramsey's August 25 notes memorializing the alleged meeting. *See* [Doc. No. 27-13] at 2.

To be sure, a court should not adopt a party's version of events when it "is blatantly contradicted by the record."  Def.'s Reply [Doc. No. 37] at 3 (quoting *Fid. & Deposit Co. of Md. v. Riess Fam., LLC*, 769 F. App'x. 538, 544 (10th Cir. 2019) (citing *Scott v. Harris*, 550 U.S. 372, 380 (2007))).   But this "narrow" exception demands "visible fiction" between the party's version of events and the evidence in the record.  *Janny v. Gamez*, 8 F.4th 883, 901 (10th Cir. 2021), *cert. dismissed sub nom. Carmack v. Janny*, 142 S. Ct. 878 (Jan. 26, 2022) (quoting *Scott*, 550 U.S. at 381).  Mr. Ramsey's after-the-fact notes,

which were entered into the system one day before Plaintiff began her FMLA leave, are not so definitive to fit into this exception.  *Cf. Scott*, 550 U.S. at 380 (finding no genuine dispute when video clearly showing respondent driving erratically contradicted testimony that he was driving safely); *Fid. & Deposit Co. of Md.*, 769 F. App'x. at 543 (same when timestamps contradicted plaintiff's claim that she read email before executing agreement).  While Mr. Ramsey's notes may implicate the credibility of his testimony, a reasonable factfinder could conclude that he did not discuss the June/July complaints with Plaintiff before she took FMLA leave.

Mr. Ramsey discussed the September one-on-one feedback with Plaintiff upon her October 11 return.  During that meeting, he mentioned Plaintiff's subordinates felt she "pushed them off" because she instructed them to look elsewhere for answers.  Plaintiff testified that Mr. Ramsey did not discuss additional performance concerns or the potential for discipline during this meeting.  As a result, she believed his comments involved her communication skills in the weeks leading up to her FMLA leave—which she admitted could have been impaired by her illness—and not her general communication skills with the team.  Accordingly, a reasonable factfinder could conclude that, like the "casual" first meeting in *Ibrahim*, Plaintiff did not "perceive [Mr. Ramsey's] comments as a warning or a recommendation about how to communicate" with her team generally.  994 F.3d at 1200.

Finally, the investigation following the October 21 group meeting would permit a reasonable factfinder to infer pretext.  Following this meeting, Ms. Boone contacted Mr. Ramsey about her concerns and the reactions of Plaintiff's subordinates.  During a short meeting, Mr. Ramsey asked Plaintiff what happened—which she generally admitted—but

21

went no further.  This is similar to the second meeting in *Ibrahim*, in which the employer's "investigation consisted solely of asking Dr. Ibrahim what he had said" to the delegate.  *Id.* And, like the employee in *Smothers*, Plaintiff was never given an opportunity to rebut her co-worker's version of events.  Mr. Ramsey then asked Ms. Boone and Ms. Newton to provide additional details about Plaintiff's earlier shortcomings.  But unlike in *Smothers* and *Ibrahim*, where the supervisors at least discussed the incidents with the employees, there is no evidence in the record that anyone had a conversation with Plaintiff about these older incidents, much less gave her an opportunity to respond.  Additionally, because there is no suggestion that American Fidelity solicited these examples until after Mr. Ramsey had recommended Plaintiff's termination, a reasonable jury could conclude that these examples were not the genuine motivation for Plaintiff's termination.[13]

After Mr. Ramsey provided these documents to Ms. Walling, she "sought and obtained approval to terminate" Plaintiff.  Walling Dec. [Doc. No. 27-1] ¶ 11.  There is no evidence in the record that Ms. Walling, Mr. Johnson, or Mr. Rodriguez asked Plaintiff for her version of events or provided an opportunity to respond to any of the feedback they received.  Instead, like the decisionmakers in *Smothers* who relied on the complaining employee's one-sided account of events, the evidence indicates that American Fidelity relied heavily on the unchallenged feedback of Plaintiff's coworkers in justifying her termination.  Because the nature of this investigation would permit a reasonable factfinder

---

[13] Conversely, a jury could conclude that these examples lend credence to American Fidelity's assertion that Plaintiff had been struggling to adequately perform her job.  Nevertheless, Plaintiff has proffered sufficient evidence to create a genuine dispute, precluding summary judgment in American Fidelity's favor.

to conclude that American Fidelity's proffered reason was pretextual, the Court DENIES the Motion with respect to the retaliation claim.

### B.  FMLA Interference

The FMLA makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter."  29 U.S.C. § 2615(a)(1).  To state an FMLA interference claim, "[P]laintiff must establish (1) that [s]he was entitled to FMLA leave, (2) that some adverse action by the employer interfered with h[er] right to take FMLA leave, and (3) that the employer's action was related to the exercise or attempted exercise of h[er] FMLA rights."  *Jones v. Denver Pub. Sch.*, 427 F.3d 1315, 1319 (10th Cir. 2005).  Interference claims are not subject to the same burden-shifting framework as retaliation claims.  Instead, "the employer bears the burden of proof on the third element of an interference claim once the plaintiff has shown her FMLA leave was interfered with."  *Campbell v. Gambro Healthcare, Inc.*, 478 F.3d 1282, 1287 (10th Cir. 2007).  That is, "[i]f the plaintiff shows that her FMLA leave was interfered with, the burden shifts to the employer to show that the adverse action would have been taken regardless of the employee's FMLA leave."  *McCully v. Am. Airlines, Inc.*, 695 F. Supp. 2d 1225, 1248 (N.D. Okla. 2010), *aff'd*, 406 F. App'x. 260 (10th Cir. 2010).

Unlike her retaliation claim, which involves her *continuous* FMLA leave, Plaintiff's interference claim is premised upon her *intermittent* leave request.  American Fidelity contends that Plaintiff's recovery is barred because—although her request for intermittent leave was approved—she never requested or took time off pursuant to this approval.  Though neither party cites any caselaw germane to this argument, the Court finds *Gaines*

*v. W&W Steel* persuasive given the similarity to the facts here.  No. CIV-12-1176-R (W.D. Okla. Jan. 24, 2014) (denying employer's renewed motion for judgment as a matter of law). In *Gaines*, an employee obtained certification for intermittent FMLA leave in 2010.  Six days before she would have been eligible to apply for intermittent leave again in 2011, her employer effectively terminated her.  The employer argued there was no legal basis for an FMLA interference claim because the employee "bears the burden to show that the adverse action interfered with her actual attempted usage of FMLA rights, *i.e.*, a request for leave, as opposed to her potential entitlement to FMLA rights." *Id.* at 5.  United States District Judge David Russell disagreed, concluding "there [was] sufficient evidence in the record for a reasonable jury to find that [the employee] suffered an adverse action" because her employer "interfered with [her] right to take future intermittent FMLA leave." *Id.* at 7. Accordingly, the Court concludes that Plaintiff's *approval* for intermittent FMLA leave may serve as the basis for her FMLA interference claim.

Plaintiff has satisfied the first element of her claim by proffering evidence that she was approved to take intermittent FMLA leave from October 6 through December 31.  To satisfy the second element of her interference claim, Plaintiff "must show that she was prevented from taking the full 12 weeks[ ] of leave guaranteed by the FMLA, denied reinstatement following leave, or denied initial permission to take leave." *Dalpiaz v. Carbon Cnty.*, 760 F.3d 1126, 1132 (10th Cir. 2014) (quoting *Campbell*, 478 F.3d at 1287). Plaintiff alleges that American Fidelity prevented her from taking 12 weeks of FMLA leave

because it terminated her on November 3—within her approved intermittent leave period.[14]

American Fidelity disagrees, relying on evidence that each of Plaintiff's FMLA requests were approved, "none of her supervisors tried to discourage her from taking [leave]," and "no one spoke negatively to her about taking [leave]."  Def.'s Mot. [Doc. No. 27] at 26. But this evidence does not meaningfully refute Plaintiff's argument because she "alleges that the primary act that interfered with her use of FMLA was not denial of her leave requests, but rather her termination." *Daimaru v. Wayfair, LLC*, 2022 WL 4467453, at *5 (D. Utah Sept. 26, 2022), *appeal dismissed*, 2023 WL 2680171 (10th Cir. Feb. 10, 2023).

To carry its burden, American Fidelity must "show that the adverse action would have been taken regardless of [Plaintiff's] FMLA leave."  *McCully*, 695 F. Supp. 2d at 1248.  American Fidelity contends that its "decision to terminate [Plaintiff's] employment was based solely on her poor work performance before and after her FML in 2021."  Def.'s Mot. [Doc. No. 27] at 27.  In support of its argument, American Fidelity cites to (1) Ms. Pledger's comments in Plaintiff's 2019 review, (2) Mr. Ramsey's comments in Plaintiff's 2021 review, (3) the June/July 2021 complaints about Plaintiff's knowledge and tact, (4) the disputed August 24 meeting, (5) Plaintiff's subordinates' comments during the September one-on-one meetings, (6) Mr. Ramsey's October 11 meeting with Plaintiff, and (7) Plaintiff's October 21 meeting with her team and Ms. Boone's follow-up email.

---

[14] Plaintiff began taking continuous FMLA leave on August 26 and returned on October 11, about six calendar weeks later.  Though she had been approved to take intermittent FMLA leave, she did not take time off pursuant to that approval.  Accordingly, she had not taken 12 full weeks of leave at the time of her termination.

Viewing this evidence in the light most favorable to Plaintiff, there is a genuine question over whether American Fidelity terminated her "because it sincerely, even if mistakenly, believed" its proffered justification. *Dalpiaz*, 760 F.3d at 1134 (quoting *Kendrick v. Penske Transp. Servs.*, 220 F.3d 1220, 1233 (10th Cir. 2000)).

For example, though Ms. Pledger highlighted Plaintiff's communication issues in the 2019 review, she raised Plaintiff's ranking from a 2.0 to a 3.0 the following year and praised her growth.  In June of 2021, Mr. Ramsey ranked Plaintiff as a 3.0 and agreed their annual review meeting was not meant to counsel Plaintiff or convey that she was performing below standard.  Nevertheless, American Fidelity collected several examples from this time period and included them in the Special Review used to justify Plaintiff's termination.  A reasonable factfinder could conclude that American Fidelity viewed Plaintiff's performance favorably between at least June 2020 and June 2021, but retroactively changed its perception *after* she requested intermittent FMLA leave.  And in light of the inadequate investigation discussed *supra*, a reasonable jury could conclude that American Fidelity did not sincerely believe Plaintiff's termination was justified by the June/July complaints, the September one-on-one complaints, or the October 21 virtual meeting and resulting email from Ms. Boone.  Accordingly, Plaintiff has proffered sufficient evidence to submit her FMLA interference claim to a jury.

### C.    Title VII Gender Discrimination

Title VII prohibits an employer from discriminating against an employee on the basis of sex.  *See* 42 U.S.C. § 2000e-2(a)(1).  Absent direct evidence of such discrimination, the *McDonnell Douglas* burden-shifting framework applies.  The formulation of elements

required to establish a prima facie case is "flexible," and "may well vary, depending on the context of the claim and the nature of the adverse employment action alleged."[15]  *Bird v. W. Valley City*, 832 F.3d 1188, 1200 (10th Cir. 2016) (quoting *Plotke v. White*, 405 F.3d 1092, 1099 (10th Cir. 2005)).  "One way to [establish a prima facie case] is to show that (1) [Plaintiff] was a member of a protected class (2) who was terminated (3) despite being qualified for her position, and (4) the job wasn't eliminated." *Fassbender v. Correct Care Sols., LLC*, 2018 WL 2208473 (10th Cir. May 15, 2018) (citing *Perry v. Woodward*, 199 F.3d 1126, 1138 (10th Cir. 1999)).  Plaintiff's burden to establish a prima facie case is "one of production, not persuasion" and "involve[s] no credibility assessment." *Plotke*, 405 F.3d at 1099.  Plaintiff must only make a "de minimis showing," as her burden to establish a prima facie case "is not onerous." *Bird*, 832 F.3d at 1200–01 (first quoting *Plotke*, 405 F.3d at 1102; then quoting *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981)).

Plaintiff has met this burden.  She is a member of a protected class by virtue of being female.  *See* 42 U.S.C. § 2000e-2(a)(1); *E.E.O.C. v. PVNF, L.L.C.*, 487 F.3d 790, 801 n.1 (10th Cir. 2007).  The parties agree that American Fidelity terminated Plaintiff and subsequently filled her former position, satisfying the second and fourth elements.  Plaintiff relies on three categories of evidence to show she was qualified for her position.  Though she first references "her own testimony that she was satisfactorily performing her duties," she provides no citation to the record to support this assertion.  Pl.'s Resp. [Doc. No. 32]

---

[15] Indeed, the parties recite different formulations.  *Compare* Def.'s Mot. [Doc. No. 27] at 27, *with* Pl.'s Resp. [Doc. No. 32] at 25.

at 25.[16]   Next, she highlights "her prior positive performance evaluations."  *Id.*  Plaintiff can satisfy her burden by presenting "credible evidence that she continued to possess the objective qualifications she held when she was hired."  *MacDonald v. E. Wyo. Mental Health Ctr.*, 941 F.2d 1115, 1121 (10th Cir. 1991), *abrogated on other grounds by Randle v. City of Aurora*, 69 F.3d 441 (10th Cir. 1995).   Plaintiff has proffered evidence that American Fidelity rated her as a 3.0 out of 4.0—indicating her "performance was consistently at and sometimes above the duties and competencies as defined in the job description"—in her two most recent performance reviews, and that Mr. Ramsey completed his favorable review less than six months before her termination.  [Doc. Nos. 27-11; 32-4].  Finally, Plaintiff argues that she served in her role for several years before her termination.   Long tenure in a role is relevant to the prima facie inquiry.   *See MacDonald* (considering fact that plaintiffs held positions for four years as supporting prima facie case).   At the time of her termination, Plaintiff had worked for American Fidelity for over fourteen years total, three of which were as a supervisor in the Enrollment Solutions division.  Taken as a whole, this evidence is sufficient to satisfy the third element of her prima facie case.

Because Plaintiff concedes that Defendant has produced a facially nondiscriminatory reason for her termination, the burden shifts back to her to proffer

---

[16] When asked about her "understanding about [Mr. Ramsey's] assessment of [her] performance" following her 2021 annual review, Plaintiff replied: "That I was doing a good job and that we were ready to take on the East Coast."  Six. Dep. [Doc. No.32-1] at 150:15–20.  It is not clear to the Court that this testimony can accurately be characterized as testimony that Plaintiff is satisfactorily performing her duties.   Instead, it indicates that Plaintiff believed that Mr. Ramsey perceived her performance to be adequate.

sufficient evidence of pretext.   Though the evidence regarding American Fidelity's investigation is sufficient to carry this burden, Plaintiff also proffers evidence of a comparator employee.   A party can demonstrate pretext "by providing evidence that he was treated differently from other similarly-situated, nonprotected employees who violated work rules of comparable seriousness."  *Kendrick*, 220 F.3d at 1232.  Plaintiff points to the differing treatment of Mr. A, a manager supervised directly by Ms. Walling prior to his termination.  Like Plaintiff, Mr. A struggled with performance issues, including substantive knowledge.  But Ms. Walling placed Mr. A on a 90-day performance improvement plan and counseled him about his performance before terminating him.  In contrast, American Fidelity terminated Plaintiff without formal notification of her poor performance or the imposition of an improvement plan.

American Fidelity argues that Mr. A's circumstances are inapposite for two reasons.  First, American Fidelity denies that Plaintiff and Mr. A were similarly situated because they reported to different supervisors.  Employees are similarly situated when they "deal[] with the same supervisor and [are] subject to the 'same standards governing performance evaluation and discipline.'"  *Kendrick*, 220 F.3d at 1232 (quoting *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1404 (10th Cir. 1997)).   Determining whether employees are similarly situated "is generally a fact question."  *Ibrahim*, 994 F.3d at 1197.   Here, the record indicates that Ms. Walling "sought and obtained approval to terminate" Plaintiff and "was the final decision maker with respect to [Mr. A's] termination."  Walling Dec. [Doc. No. 27-1] ¶¶ 11, 13.  Based on Ms. Walling's substantial involvement in both termination decisions, a reasonable jury could conclude that Plaintiff and Mr. A are similarly situated.

Next, American Fidelity argues that any difference in treatment stemmed from the fact that Mr. Ramsey believed Plaintiff's subordinates would quit—a concern Ms. Walling never harbored about Mr. A. To be sure, this argument may be persuasive under different circumstances. But here, there is already sufficient evidence in the record for a factfinder to reasonably conclude that American Fidelity did not honestly believe its proffered reason for Plaintiff's termination. Accordingly, that same factfinder could also reasonably conclude that Mr. Ramsey did not honestly believe that Plaintiff's subordinates would quit if American Fidelity did not terminate her immediately. Based on the evidence regarding American Fidelity's investigation, discussed *supra*, and the additional evidence about Mr. A as a comparator, the Court finds Plaintiff has proffered sufficient evidence of pretext to warrant submission of this claim to a jury.

## IV. <u>Conclusion</u>

IT IS THEREFORE ORDERED that American Fidelity's Motion for Summary Judgment and Brief in Support [Doc. No. 27] is DENIED.

IT IS SO ORDERED this 28th day of April, 2023.

<u>SCOTT L. PALK</u>
**SCOTT L. PALK**
**UNITED STATES DISTRICT JUDGE**